## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY BYNUM,

        Plaintiff,

      v.                                 Case No. C-1-04-361

FLUOR FERNALD, INC.,

        Defendant.

### ORDER

This matter is before the Court upon defendant's motion for summary judgment (doc. 17), plaintiff's opposing memorandum (doc. 23), and defendant's reply (28).  The parties have filed proposed findings of fact and conclusions of law, which the opposing side has highlighted as true, false, or irrelevant (doc. 21; doc. 28, exh. B).

### I. Introduction

Plaintiff Mary Bynum brings claims for age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and Ohio Rev. Code Ch. 4112; disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and Ohio Rev. Code § 4112.02; violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.; and violation of Ohio public policy.  Plaintiff also originally brought claims for gender discrimination in violation of state and federal law, but she has elected not to pursue those claims.

1

Defendant moves for summary judgment in its favor on the following grounds: (1) plaintiff cannot prove the fourth element of a prima facie case of age discrimination because her employment was terminated as part of a reduction in force (RIF), and she has presented no additional evidence tending to indicate that defendant singled her out for discharge for impermissible reasons; (2) plaintiff cannot establish a prima facie case of disability discrimination because she cannot demonstrate that she was disabled; (3) plaintiff cannot establish a prima facie case of FMLA retaliation because there is no evidence that defendant denied a request for FMLA leave by plaintiff and circumstantial evidence of retaliation for taking FMLA leave is lacking; (4) plaintiff's employment was terminated for legitimate, non-discriminatory reasons, and there is no evidence of pretext; and (5) plaintiff's public policy claim must be dismissed because her claims that she was discharged for discriminatory and retaliatory reasons are without merit.

## II. Request for oral argument

The legal and factual issues involved in this case are not complex and they have been fully briefed by the parties. Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern District of Ohio, the Court therefore finds that oral argument is not necessary and plaintiff's request for same is denied.

## III. Undisputed facts

1.  Defendant Fluor Fernald, Inc. is an employer as defined by the pertinent statutes.

2.  Plaintiff was an employee of defendant from 1993 until July 7, 2003.

3.  In 1992, defendant began performing environmental clean-up activities at the former uranium metal processing facility in Fernald, Ohio (Fernald) under a contract awarded by the United States Department of Energy (DOE).

2

4.      On December 1, 2001, DOE and defendant entered into a new contract which provided for closure of the site by a target date (Closure Contract).

5.      By June 2001, defendant had completed a plan or baseline for closure in 2009 and had submitted it to DOE for approval.

6.      In late 2001 or early 2002, DOE advised defendant that the 2009 baseline was not acceptable and that closure was to be achieved by 2006.

7.      At that point, work began on planning for a 2006 baseline.  As of December 2005, closure was scheduled for June 2006.

8.      The 2009 baseline used a Manpower Planning System (MPS) that identified between 80 and 90 different sets of skills, or Manpower Planning Classifications (MPCs) for salaried employees.  In contrast, defendant's personnel system used about 450 narrower job titles.  Generally, MPCs include several job titles and may include employees from various organizations across the site.

9.      Defendant used the baseline to identify the number of workers required in each MPC at various intervals.  To determine if reductions were needed in a particular MPC, the number of workers in each MPC was compared with the number called for by the baseline in that MPC.  Based on such comparisons throughout the closure process, defendant determined what reductions in the salaried workforce were needed from 2002 until closure.

10.     Beginning in early 2001, defendant began the process of "cross-walking" each job title into the appropriate MPC.  Although the vast majority of this work had been completed by the summer of 2001, the process was ongoing.

3

11.     By October 2001, defendant had advised salaried employees of their MPCs.

12.     In the late spring of 2001, defendant hired William M. Mercer (Mercer), a human

        resources consulting firm, to assist in the design and implementation of plans to reduce the

        work force.  Defendant approved a multi-faceted process developed by Mercer that was to

        be used in each of the workforce reductions through the date of site closure.

13.     Mercer's process involved an initial voluntary phase called the Voluntary Separation

        Program (VSP), which included monetary incentives offered to employees in an

        overstaffed MPC who voluntarily chose to leave employment.  If voluntary reductions in

        an MPC were insufficient, an involuntary phase called the Involuntary Separation

        Program (ISP) would follow.

14.     Defendant designated a Functional Job Review Team (FJRT) for each declining MPC.

15.     The managers who were to perform the employee ratings received training from Mercer.

16.     The managers rated individual employees on a scale of "1" to "5" ("1" being the highest

        rating) using ratings forms that contained FJRT skill descriptions.

17.     After the individual ratings had been completed, the Human Resources Department

        calculated an overall rating for each employee based on the individual employee ratings

        and the weight assigned to each skill.

18.     Employees in each MPC were then ranked from highest to lowest according to their

        overall rating score on a Functional Ranking Report (FR Report).

19.     FJRTs used the FR Reports to recommend employees for retention and termination.

        Generally, recommendations were based on numerical rankings in the FR Report, with

        relatively lower-rated employees being selected for separation.

20. Finally, the Senior Management Team (SMT), made up of the Company President and a small number of other individuals appointed by the President, either approved or disapproved the FJRT recommendations for each MPC.

21. Plaintiff's most recent position with defendant was as a Cost Analyst. In that position, she produced monthly reports for the cost management system and workscopes; entered and gathered data; prepared her department for presentations for DOE project meetings; and functioned as a safety advocate for the Administrative Work Group.

22. In October 2001, plaintiff was advised that her Cost Analyst II job title was in the Cost Analyst MPC and that the number of employees in that MPC would be reduced.

23. A VSP with enhanced separation benefits was offered, but plaintiff chose not to participate in it.

24. The VSP did not achieve sufficient reductions, thus necessitating an ISP in April 2002.

25. The Mercer process was used to select employees for the April 2002 ISP.

26. The Cost Analyst MPC was divided into two subgroups, with the X subgroup consisting of Cost Analyst I and II job titles and the Y subgroup consisting of Cost Analyst III and Senior Cost Analyst job titles.

27. As a Cost Analyst II, plaintiff's skills were rated and she was ranked with the other employees in the X subgroup of the Cost Analyst MPC.

28. Two employees ages 49 and 54 from plaintiff's MPC subgroup were selected for termination on April 4, 2002.

29.    Plaintiff, who on that date was one month short of age 59 and was the oldest employee in the MPC subgroup, was not selected due to her rating and ranking in relation to the other employees in that subgroup.

30.    Following the April 2002 ISP, plaintiff's Cost Analyst MPC had been combined with the Scheduler MPC and renamed the Project Controls Representative MPC in preparation for further reductions in the workforce.  The MPC was divided into Jr. and Sr. subgroups.

31.    Defendant assigned Wayne Reed, Project Controls Manager, and Terry Hagen, head of Closure Project Management, to the FJRT for the Project Control Representatives MPC.

32.    A VSP was again offered following the April 2002 ISP.

33.    An ISP occurred in August 2002.  Defendant decided not to implement an involuntary reduction in the Project Controls Representative MPC during that ISP.

34.    Once the Project Control Representatives were rated, Human Resources applied the Skills Weightings to the ratings and compiled an FR Report.  This Report listed the Project Control Representatives in order from highest scores to lowest.

35.    Both Human Resources and the FJRT were supposed to review the FR Report and the individual ratings to assure that no inappropriate bias had influenced the results.

36.    Generally, the employees with the lowest rankings were subject to involuntary separation until the target number of reductions was reached.  Exceptions were to be justified in writing and approved by the SMT.

37.    Additionally, FJRTs were not supposed to reclassify employees in order to remove them from "at risk" status.

38.   Mercer trained raters to avoid pitfalls such as looking only at what an employee had done in the recent past rather than looking at the employee's long-term performance.

39.   Reed completed plaintiff's May 2003 Individual Employee Rating Form (IERF).

40.   On previous IERFs, there were no categories in which plaintiff did not meet expectations.

41.   Plaintiff had met expectations for communication skills on her performance assessment completed less than a year before the May 2003 IERF.  Reed rated her communication skills as a "4" on her May 2003 IERF, meaning "occasionally fails to meet expectations." Reed noted that plaintiff had "poor communication skills due to lack of Project Controls experience;" she had a difficult time working independently and she needed constant supervision to complete assignments, with Reed noting "employee needs more experience and time working in Project Controls - cannot perform routine duties in Project Controls;" she occasionally failed to meet some standards and expertise in the area of technical knowledge; and she "met expectations" in the category of Work Habits.  In all, plaintiff was rated as failing to meet expectations in three of the five categories on the 2003 IERF.

42.   The Mercer process was again used to select employees for an ISP that was to take place in July 2003.

43.   The FJRT maintained the division of the Project Controls Representative MPC into Jr. and Sr. subgroups.

44.   The Jr. subgroup consisted of all seven employees who held Cost Analyst I and II job titles, including plaintiff.

45.    The two employees with the lowest ranking in the Jr. subgroup were selected for the RIF. Those employees were plaintiff, age 60, and Deborah Sherbs, age 41.

46.   Defendant informed plaintiff on June 16, 2003, of her "at risk" status for termination in the ISP and advised her that, barring any change in the current situation, her employment would be terminated on July 7, 2003.  The risk notification reminded her that she could still sign up for the VSP while it remained open.  Plaintiff did not elect the VSP.

47.   On July 7, 2003, plaintiff was terminated in the ISP.

48.    Mercer's adverse impact analysis prepared on June 16, 2003, revealed a "statistically significant adverse impact on employees age 40 or older in the selection for the June 2003" RIF.

49.   During the July 2003 ISP process, Mercer conducted a series of statistical analyses  of preliminary lists of employees to be affected by the ISP.  The analyses concluded there was no adverse impact on employees forty and older in relation to selection for the ISP.

50.   Dr. Bernard Siskin, a statistician employed by defendant as an expert in this case, analyzed the final July 2003 RIF list of 29 employees and found that there was no valid statistical evidence that age played any role in the ISP.

51.   Dr. Siskin concluded that after the 2003 RIF, the average age of defendant's workforce increased from 45.7 to 46.8; the percentage of the workforce that was age 40 or older increased from 71.6 to 77.8; and the percentage of the workforce that was age 50 or older increased from 33.0 to 36.0.

52.   Prior to the first ISP that occurred in April 2002, there were nearly 1,000 salaried employees of defendant at Fernald.

53.   A total of 138 employees were selected for termination as part of the 2002 ISPs, with an additional 29 employees selected in the July 2003 ISP.

54. RIFs continue as the Fernald site nears the projected closure date.

55. As of December 2005, approximately 350 salaried company employees remained at Fernald.

56. Virtually the entire workforce of defendant will be eliminated as the project reaches completion and is closed during 2006.

57. Prior to her termination, starting in May 2002, plaintiff had taken a series of FMLA leaves for the diagnosis and treatment of breast cancer. She returned from her last FMLA leave on April 21, 2003.

### III. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

9

a verdict for that party.  *Id.* at 249 (citing *Cities Serv.*,  391 U.S. at 288-289).  If the evidence is

merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly

probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted.  *Anderson*, 477 U.S. at 249.

## IV. Opinion

### A. Age discrimination claims

Federal case law interpreting Title VII is generally applicable to claims brought under the

ADEA and cases involving alleged violations of Ohio Rev. Code Ch. 4112.  *See Minadeo v. ICI*

*Paints,* 398 F.3d 751, 763 (6th Cir. 2005); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.

1992); *Plumbers & Steamfitters Joint Apprenticeship Committee v. OCRC*, 66 Ohio St.2d 192,

196, 421 N.E.2d 128, 131 (1981).  A plaintiff claiming discrimination under federal or Ohio law

may establish her case by introducing either direct or circumstantial evidence that the defendant

discharged the plaintiff because of her membership in a protected class. *See Manzer v. Diamond*

*Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994). Plaintiff may establish a prima

facie case of discrimination through circumstantial evidence by showing that: 1) she is a member

of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the

position lost or not gained; and 4) the position was filled by someone outside of the protected

class. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824

(1973); *Gagne v. Northwestern National Insurance Co.,* 881 F.2d 309, 313 (6th Cir. 1989)).

Plaintiff may also establish the fourth prong of a prima facie case of discrimination by showing

that she was treated less favorably than a similarly-situated employee outside of her protected

class. *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).  In such a case, plaintiff must

prove that all relevant aspects of her employment situation were similar to those of the employee

10

with whom she seeks to compare herself. ***Ercegovich v. Goodyear Tire & Rubber Co.,*** 154 F.3d 344, 352 (6th Cir. 1998)

To establish the fourth prong of her prima facie case of age discrimination, plaintiff must show that she was replaced by, or treated less favorably than, a significantly younger individual, which may include an individual within the protected class. ***O'Connor v. Consolidated Coin Caterers Corp.,*** 517 U.S. 308, 313, 116 S.Ct. 1307, 1310 (1996); ***Coryell v. Bank One Trust Company N.A.,*** 101 Ohio St.3d 175, 180, 803 N.E.2d 781, 787 (2004). In the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and her replacement or the individual with whom she seeks to compare herself is not significant. ***Grosjean v. First Energy Corp.,*** 349 F.3d 332, 340 (6th Cir. 2003).

In situations involving reductions in force, in order to establish the fourth element of the prima facie case, the plaintiff must present additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. ***Barnes v. GenCorp, Inc.,*** 896 F.2d 1457, 1465 (6th Cir. 1990). The Sixth Circuit in

11

***Barnes*** explained the need for additional evidence in the context of a RIF:

> When work force reductions by the employer are a factor in the decision, 'the most common legitimate reasons' for the discharge are the work force reductions. By showing the other elements of a ***McDonnell Douglas*** case, a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. ***Id.*** (citing ***LaGrant v. Gulf and Western Mfg. Co.,*** 748 F.2d 1087, 1090 (6th Cir.1984) ("[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination"); ***McMahon v. Libbey-Owens-Ford Co.,*** 870 F.2d 1073 (6th Cir.1989); ***Sahadi v. Reynolds Chemical***, 636 F.2d 1116, 1118 (6th Cir.1980). Our conclusion would not change even if a plaintiff additionally demonstrated that younger persons were retained in other jobs which the plaintiff was qualified to perform. A different result would allow every person age 40-and-over to establish a prima facie case of age discrimination if he or she was discharged as part of a work force reduction.

***Id.*** at 1465.

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. ***McDonnell Douglas,*** 411 U.S. at 802, 93 S.Ct. at 1824. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. ***Id.*** at 804, 93 S.Ct. at 1825.

The United States Court of Appeals for the Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the discharge; or 3) the reasons were insufficient to warrant a discharge. ***Manzer,*** 29 F.3d at 1084. The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, i.e., that the reason is factually

12

false. *Id.* The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id.* For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, plaintiff may not rely simply upon her prima facie evidence but must instead introduce additional evidence of discrimination that would permit a reasonable jury to conclude that such evidence overwhelms defendant's non-discriminatory reasons. *Id.*

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination. ***Wexler v. White's Furniture, Inc***., 317 F.3d 564, 576 (6th Cir. 2003).  The Court in ***Wexler*** addressed the extent to which the reasonableness of an employer's decision may be considered:

> [T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. ***Smith v. Chrysler Corp*.**, 155 F.3d 799, 807 (6th Cir.1998) (holding that, in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into 'whether the employer made a *reasonably informed and considered decision* before taking an adverse employment action') (emphasis added); ***In re Lewis***, 845 F.2d 624, 633 (6th Cir.1988) ('Sears does not have to establish that the basis on which it acted in firing Lewis was *sound;* rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.') (emphasis in original) (internal quotation marks omitted).

*Id.*

Plaintiff argues that evidence showing that five of the six substantially younger employees in her MPC were retained while plaintiff, the oldest employee in her MPC, was terminated is sufficient to satisfy the fourth prong of her prima facie case. To support her position, plaintiff relies on the Sixth Circuit's decision in **Skalka v. Fernald Environmental Restoration Management Corp.,** wherein the Sixth Circuit stated that additional evidence in the context of a RIF may include evidence that "persons outside the protected class were retained in the same position." 178 F.3d 414, 420-21 (citing **EEOC v. Clay Printing Co.,** 955 F.2d 936, 941 (4th Cir. 1992)). Plaintiff's situation differs from that of plaintiff Robert Skalka in the **Skalka** case, however, because there was additional evidence of age discrimination against Skalka. Specifically, in addition to being the oldest employee in his peer group, Skalka was also rated the most competent employee in the group. In contrast, plaintiff was one of the two lowest-rated individuals in her MPC and relies solely on her age in comparison to the ages of the individuals in her MPC who were retained in an attempt to establish her prima facie case. The Sixth Circuit has specifically determined in a case decided subsequent to **Skalka** that the mere fact that a terminated employee was the oldest in the individual's department is insufficient to create suspicious circumstances under the ADEA. **See Almond v. ABB Industrial Systems, Inc.,** 56 Fed. Appx. 672, 678, 2003 WL 173640 (6th Cir. 2003) (not published in the Federal Reporter); **see also Adams v. Proto Plastics, Inc.,** 151 Fed.Appx. 468, 469-70, 2005 WL 2757701 (6th Cir. 2005) (distinguishing **Ercegovich,** wherein the plaintiff was denied the same opportunity to transfer to another position as was extended to younger employees involved in the RIF, and declining to adopt the plaintiff's position that **Ercegovich** "allows the fourth element [of a prima facie case] to be satisfied whenever substantially younger employees in positions comparable to the plaintiff's

are not terminated." Consistent with these decisions, plaintiff cannot establish the fourth prong of her prima facie case merely by showing that she was the oldest individual in her MPC and that she was terminated as part of the RIF while some younger individuals were retained.

Assuming the evidence produced by plaintiff were sufficient to satisfy her prima facie case, defendant has articulated a legitimate non-discriminatory reason for plaintiff's termination, i.e., plaintiff was one of two employees in her MPC terminated as part of the RIF because she and the other employee had received the lowest ratings of all the employees in that MPC. Plaintiff relies on the following evidence to support her argument that the reason articulated by defendant for her discharge is pretextual: (1) defendant deviated from the selection process designed by Mercer; (2) defendant's low ratings of plaintiff were inconsistent and not justified; and (3) defendant's adverse impact analysis reveals age bias.

As to the first basis, plaintiff alleges that although members of the FJRT for a particular MPC were not supposed to complete the evaluations for employees in that MPC so as to prevent the raters from knowing the weight assigned to the individual categories on the evaluation, Reed was a member of the FJRT for plaintiff's MPC and was likewise responsible for completing plaintiff's evaluation. Plaintiff alleges that as a consequence, Reed was aware of the significantly higher weight accorded to a category for which he assigned plaintiff the second-lowest possible score, a "4." Plaintiff contends that this deviation could allow a jury to believe that her age and/or disability were motivating factors in defendant's decision to terminate her. There is simply nothing in the record, however, that would permit a reasonable jury to infer that defendant

15

deviated from the normal process in this manner and that Reed gave her a less than desirable

score in a heavily weighted category out of a desire to discriminate based on plaintiff's age or any

other basis.

As additional evidence of pretext, plaintiff points to discrepancies between her 2000/2001

and 2001/2002 performance evaluations and her May 2003 IERF and alleges that Reed's failure

to identify any changes in plaintiff's performance, job knowledge, or skills set from May 2002 to

May 2003 and his purported failure to offer an explanation for "stark differences" in the

evaluations show that some motive other than a truthful assessment of plaintiff's skills and

performance influenced the ratings. Plaintiff is wrong, however, in asserting that defendant has

not offered an explanation for differences in the evaluations. To the contrary, Reed explained at

his deposition that the 2002 and 2003 ratings could not be compared because the ratings were not

based on employees' past performance but were instead rankings based on the skills needed to

complete the job at Fernald. Reed depo., pp. 24, 68, 90-91, 93. Reed testified that all the

employees were good employees but that it was necessary to raise the bar on successive

evaluations and "look at it as the employees that you need to finish the job." *Id*. at 90-91.

Plaintiff points to no evidence that would cast doubt on the credibility of Reed's explanation. It is

not the province of the court or the trier-of-fact to second-guess defendant's business judgment to

rank employees in this manner, to rate plaintiff as it did in particular categories, and to assess how

plaintiff's skills in various categories deemed essential to the latter phases of the clean-up

compared to those of other employees in her MPC. Because defendant has offered a legitimate

explanation for the discrepancies in plaintiff's evaluations, and because there is no evidence to

suggest that the 2003 ratings were manipulated for the purpose of terminating older employees in

16

plaintiff's MPC, the variance between plaintiff's evaluations is not probative of a discriminatory animus.

Finally, plaintiff's reliance on defendant's failure to make any changes to the list of employees slated for termination following Mercer's June 16, 2003 adverse impact analysis, which disclosed a "statistically significant adverse impact on employees 40 or older in the selection for the June 2003" RIF, is not sufficient to establish pretext.  First, plaintiff does not allege that a "statistically significant adverse impact" on employees 40 or older was found with respect to those employees who were actually terminated as part of the July 2003 ISP.  Second, evidence that a company-wide analysis of a preliminary list of employees to be selected for termination disclosed an adverse impact on older employees does not cast doubt either on the validity of the ratings assigned to plaintiff by Reed or defendant's explanation that plaintiff was terminated based on those ratings, particularly since the only other individual in plaintiff's MPC who was terminated was a significantly younger individual.  Thus, because plaintiff has not come forward with evidence of pretext, the age discrimination claim must be dismissed.

### B. Disability discrimination

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" because of that individual's disability.  42 U.S.C. § 12112(a).  Ohio Rev. Code § 4112.02(A) makes it an unlawful discriminatory practice "For any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio courts look to regulations and cases interpreting the ADA for guidance in interpreting Ohio law.  ***See Columbus Civil Service Comm.***

17

*v. McGlone,* 82 Ohio St.3d 569, 573, 697 N.E.2d 204, 206-07 (1998) (citing *Little Forest Med.*

*Ctr. v. OCRC,* 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991)).

If a plaintiff seeks to establish her case indirectly without direct proof of discrimination,

she may establish a prima facie case by showing that: "1) [she] is disabled; 2) [she is] otherwise

qualified for the position with or without reasonable accommodation; 3) [she] suffered an adverse

employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and

5) the position remained open while the employer sought other applicants or the disabled

individual was replaced." *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1186 (6th Cir.

1996). The employer must then offer a legitimate reason for its action. *Id.* If the employer does so,

plaintiff must introduce evidence showing that the proffered reason is pretextual. *Id.*

An individualized inquiry must be made into whether an individual is disabled, and

measures that mitigate an individual's impairment must be taken into account. *Cotter v. Ajilon*

*Servs., Inc.,* 287 F.3d 593, 598 (6th Cir. 2002) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S.

471, 483, 119 S.Ct. 2139 (1999)). An individual is considered "disabled" under the ADA if she:

> (A) [has] a physical or mental impairment that substantially limits one or more of
> the major life activities of such individual;
> (B) [has] a record of such an impairment; or
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

The regulations accompanying the ADA define "major life activities" as "functions such as

caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working." 29 C.F.R. § 1630.2(i). The regulations define "substantially limit[ed]" to

mean "[u]nable to perform a major life activity that the average person in the general population

can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an

individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(2001).  The regulations set forth the following factors to be considered in determining whether an individual is  "substantially limited" in a major life activity:

(i) The nature and severity of the [claimant's] impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

The Supreme Court has stated that the terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 691 (2002). Any impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA.  *Mahon v. Crowell,* 295 F.3d 585, 590-91 (6th Cir. 2002).

An individual may be regarded as disabled if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton,* 527 U.S. at 489, 119 S.Ct. at 2150. "This part of the Act is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of "myths, fears, and stereotypes" accruing around a perceived impairment.  *Mahon,* 295 F.3d at 592 (citing *Sutton,* 527 U.S. at 489-90, 119 S.Ct. 2139).

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to whether she is disabled.  Plaintiff simply argues that the evidence establishes that her "cancer

19

forced her to take a series of extensive leaves of absence during which she could not work."

Plaintiff's opposing memorandum, p. 11.  Plaintiff argues that a jury should be allowed to decide

whether these limitations satisfy the definition of disability.  However, the need to take one or

more extensive leaves of absence does not establish a substantial limitation on the ability to

perform a major life activity.  At most, plaintiff suffered from an impairment of limited duration.

She has not shown that her cancer had a lasting impact on her ability to work or perform any other

major life activity.  In fact, plaintiff had returned to work at the time of the July 2003 RIF, and she

does not allege that she had any restrictions resulting from her cancer upon her return to work.

Moreover, plaintiff has not presented any evidence to support a finding that defendant perceived

her as disabled.  Accordingly, defendant is entitled to summary judgment on plaintiff's disability

discrimination claim.

### C. FMLA violation

In FMLA cases that rely upon indirect evidence, the three-step ***McDonnell Douglas***

paradigm applies.  ***See Skrjanc v. Great Lakes Power Service Co.,*** 272 F.3d 309, 315 (6th Cir.

2001).  A plaintiff may establish a prima facie case of retaliatory discharge under the FMLA by

showing that (1) she availed herself of a protected right under the FMLA, (2) she was adversely

affected by an employment decision, and (3) there is a causal connection between her exercise of a

right under the FMLA and the adverse employment decision. ***Id.*** at 314 (citing ***Canitia v. Yellow***

***Freight Sys., Inc.***, 903 F.2d 1064, 1066 (6th Cir. 1990)).  The burden then shifts to the defendant

to articulate a legitimate, nondiscriminatory reason for the adverse employment action. ***Id.*** at 315.

If the defendant articulates such a reason, then the plaintiff has the burden of showing that the

articulated reason is a pretext for discrimination. ***Id.***  In order to establish a causal link, the

plaintiff must "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990) (*quoting Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

Evidence that the defendant treated the plaintiff differently from similarly-situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000) (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)); *see also Ford v. General Motors Corp.,* 305 F.3d 545, 554-55 (6th Cir. 2002)).  The Sixth Circuit has stated that while "'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.'"  *Ford,* 305 F.3d at 554-55 (quoting *Moon,* 836 F.2d at 229); *see also DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.")

Plaintiff relies solely on the three-month period between her taking of FMLA leave and her discharge to show a causal connection between the two events.  This is not a case where temporal proximity alone is sufficient to permit an inference of retaliation in view of the fact that plaintiff was discharged along with numerous other employees as part of a RIF, the timing of which was in no manner related to her taking of FMLA leave.  Accordingly, defendant is entitled to summary judgment on the FMLA claim.

**D. Public policy violation**

In ***Greeley v. Miami Valley Maintenance Contrs., Inc.***, 49 Ohio St.3d 228, 551 N.E.2d

981 (1990), the Ohio Supreme Court recognized the tort of wrongful discharge in violation of

public policy. The tort requires four elements: (1) a clear public policy existed and was manifested

in a state or federal constitution, statute or administrative regulation, or in the common law (the

clarity element); (2) dismissing employees under circumstances like those involved in the

plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's

dismissal was motivated by conduct related to the public policy (the causation element); and (4)

the employer lacked overriding legitimate business justification for the dismissal (the overriding

justification element). ***Collins v. Rizkana***, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653, 657-58

(1995) (citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self

Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-99). The clarity and jeopardy elements are

questions of law to be determined by the court, while the causation and overriding justification

elements are questions of fact to be left to the jury. ***Id.*** at 70, 652 N.E.2d at 658.

Because plaintiff has not produced sufficient evidence to establish her discrimination and

FMLA retaliation claims, she cannot prove the elements of her public policy claim. Defendant is

therefore entitled to summary judgment on that claim.

**V. Conclusion**

In accordance with the foregoing, defendant's motion for summary judgment is

**GRANTED.**  This case is **DISMISSED** and is **TERMINATED** on the docket of the Court at

plaintiff's cost.

**IT IS SO ORDERED.**


S/ Herman J. Weber
HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT


J:\HJWA\04-361agegndfmlaPUB.wpd